Your argument next in number 2010, K-MAR Industries against the United States. Before we start the argument, we've had a request. I guess it's not really formal enough to be constituted as a motion, but a request from counsel to close the courtroom for this argument. We'd like to have counsel explain to us, well, two points, I guess. First, whether there is a justification for closing the courtroom in light of some need in the course of the argument to discuss confidential materials in the record. And second, if, after Mr. Basil at least departs, take your time. I'm not trying to give you the bum's rush. But after Mr. Basil departs, will there be anybody here who wouldn't be entitled to be privy to anything that is said that's confidential, if you could address yourself to those two points? I guess, Ms. David, why don't you begin? Yes, sir. Our concern for KMI was the fact that all the submissions, all the briefs in this case, have been submitted under seal, as were all the proceedings below. And the reason for that was because the intervener, Five Rivers, the awardee, who did not make an appearance on appeal, had indicated in all the proceedings below that a lot of the information that we were discussing is, in fact, protected or confidential. That has to do with its staffing plan, in particular, the total number of employees. Is that something that you need to talk about in the course of the argument? Or is that something you can simply? We know the numbers. We're familiar with those details. Let me just back up a little bit. Typically, we get a lot of cases in which there is confidential material, frequently a lot of confidential material. And we don't lightly close the courtroom. So the question is, is there a way that you can argue, knowing that we are familiar with it, we've read the briefs, we're familiar with the facts of the case, is there a way that you can argue the case? We're not sidestepping the kinds of details, the kinds of numbers that are usually the heart of the confidential material. Or is it simply impossible to do so? If it's the latter, we would consider taking some measures, which may not be necessary given the situation that we have here. The people in the balcony are all law clerks. So I think if all four of the people who are sitting in the gallery are connected to the case, then this may not be an issue. But you might address whether this is something that you can manage to argue your case without tripping over confidential material. I think I have to mention. Excuse me, Judge Brennan. It just might be an issue with respect to the oral argument posted on our website. So we'd have to be mindful of that. That's true. We would have to consider whether that should be. The rest of the world will be listening. That's right. That's right. We don't have the intervener's permission to divulge their information. That's my concern. And it has to do with the naming of their six exempt positions, and as well as the particulars of the price differential. Can we conduct the argument without naming those positions? Or discussing the pricing? Because we know, as Judge Bryson pointed out, we have to have that information. We could definitely try. But if we don't have to discuss that openly. Why don't we try? Unless the government has some different perspective on this. No, Your Honor. This is actually a plaintiff's request. We don't object or anything else. But we also don't advance that. Why don't we go ahead, and if we find ourselves incapable of proceeding, we can do so. I'll try to expand my capabilities here. I'm not sure that's what was planned. You'll do fine. Thank you. Thank you, sir. Well, I'm Marilyn David for KMI, and at my table is Russell S. Gill, also for KMI. We feel that the objective, or what we would like to see as the objective for the court today, is to focus on whether or not there was a fair competition in this case. And that means focus on whether or not there was a fair competition pre-award. Focus on the pre-award issues. And that means that we feel that the court has to consider two questions. And the first question is whether or not the Army complied with the evaluation criteria. And then the second question is whether or not Five Rivers indicated on the face of its proposal that it was not going to pay SCA-mandated wages, which are, of course, the DOL minimum wages that are given in the DOL minimum wage determination. Or did Five Rivers indicate on the face of its proposal not to comply with the Service Contract Act? Because the Service Contract Act is the act that makes those minimum wages and the other requirements of the DOL directory applicable. I'd like to start with- What you want us to do is to figure out whether these employees were exempt employees or not under the Service Contract Act, right? Ultimately, that question may come into play. If you don't believe the claims court's finding- They can't win unless we decide that they are non-exempt employees, right? We can't win unless you decide that they are not non-exempt employees. That's correct. So why is that our job? Why isn't that a job for the Department of Labor? Because the Department of Labor's jurisdiction is over post-award matters. Department of Labor considers enforcement issues and administration issues. And those matters take place after the award decision has already been made. And what we're considering here is what happened during the award process. What happened during the solicitation process in the terms of the evaluation in accordance with the solicitation? When the Army put out its evaluation criteria prior to the award, and it said, we are going to evaluate labor classifications and staffing plans, the question is, did the Army do that? And was it required to do that? Was it required to adhere to its evaluation criteria? And it plainly said, we are going to evaluate labor classifications. And the government has already admitted an oral argument, and I have the transcript there, that the Army did not evaluate those classifications in particular. Well, they did not evaluate compliance with the service contract. And they did not evaluate the individual Department of Labor classifications on page A341 and A344. They didn't get into the particulars of those classifications at all. Did the Army not have the discretion to simply accept the designation of those individuals  until there's a clear statement that the applicable regulations would be adhered to? No, they did not. Because the Service Contract Act states that it applies to all service employees unless they are exempt. And that would mean to all service employee positions. And the Service Contract Act says that certain requirements are applicable here, including minimum wage, labor burden, and other things that go along with it that affect the price offered. I guess my point is that the Army had before it a statement that the applicable Department of Labor provisions were going to be followed. No, are you talking about the general statement that five members made? The general statement, yes. Five? Five? Excuse me. Is it not sufficient for the Army to say, well, all right, there's a general statement that the regulations will be followed. And then there are statements that certain employees are exempt. Whether that's right or wrong, isn't that ultimately a risk that the proposed bidder assumes? And if the Army could simply evaluate the proposal on its face, and given the nature of the contract, being a fixed price contract, then the risk falls on the bidder. No, Your Honor, because I believe that that is viewing of this entire issue as a matter of post-award performance and when the risk falls. This court has to decide whether or not it is going to hold an agency to its evaluation criteria once the agency puts those evaluation criteria out. And in particular, this court has before made issued statements to the effect of, while procuring agencies have brought discretion, excuse me, this is the GAO, in determining the evaluation plan they will use, they do not have the discretion to announce in the solicitation that one plan will be used and then follow another in the actual evaluation. So when you put in a solicitation that you're going to evaluate labor classifications, the agency needs to evaluate them. And the reason the agency needs to evaluate them is because all the other offerors structure  around those evaluation criteria so that they can win the award. This was a $10 million contract. It was a substantial contract to the other offerors. We have another case that was cited in Red River, which was a claims court case, that says prejudice includes, quote, the agency's failure to follow its own selection process embodied in the solicitation, which is a prejudicial violation of a procurement procedure, which is established for the benefit of the offerors. So once a criterion is put in an RFP and the agency says, this is how we're going to evaluate, it doesn't matter post-award who bears the risk of loss. If the agency had not said, we're going to evaluate labor classifications during our evaluation process and put that out, then yes, those cases that say, well, it matters where the risk of loss falls because this is the firm fixed price process, those cases would come into play. But those cases are distinguishable because those cases didn't say, we're going to evaluate labor classifications. That's what the agency put out, and that's what they have to adhere to. Otherwise, the competition process is not fair, and it's not fair to the other bidders. And this is a lost opportunity for the other bidders to compete in a fair competition. We have Dubinsky, which is a case that's cited in Red River, which is a case that's in my brief, 87 claims court at 786. Dubinsky says that contracting officers are not given a carte blanche to notify offerors of one rating system in the RFP and then to apply a different system than the evaluation of proposals. So when you say you're going to evaluate labor classifications, you have to evaluate them. Where is the particular provision of the solicitation that refers to the evaluation of labor classifications? I believe it's at A38. A38? Yes. It's under paragraph one technical. And I do treat with this extensively in my brief. If you look at the first paragraph up there, it says staffing plan. The first sentence, it says staffing plan. The second sentence says labor classifications. But we need to treat with the first sentence because elsewhere in the RFP, it says that the staffing plan to be submitted has to include labor classifications. How do we know that's referring to the service contract? Excuse me? How do we know that's referring to the service contract? That evaluating labor classifications means to use the service contract act? There are several ways. One is there's no other reasonable way to evaluate labor classifications because the service contract act does govern labor classifications. And the claims court was correct when it found that. And it found that in its decision at A12, excuse me, A11, the claims court did make a finding of law that the service contract act governed the classifications. Let me verify that. Yes, footnote two, A11, service contract act governs labor classifications. That doesn't mean that that's the only purpose for which you might evaluate labor classifications. That's correct. But it is. But the service contract act is the act under which the DOL labor classifications are published. They're also referred to as the DOL job directory, or the directory. I understand. OK. You know, there can be all sorts of purposes for addressing labor classifications. And this doesn't make reference to the service contract act. The service contract act is incorporated by reference into this contract. It's incorporated by reference at. Well, we'll take your word for it. Well, I have it in my brain. Practically, these contracts incorporate practically everything. OK. It should be the Bayer statute is probably incorporated. OK, it is incorporated by reference. And also, the RFP at page 837 says that the staffing plan must include, as a minimum, management and labor classifications. So that also implicates the fact that labor classifications have to be evaluated. But your honor has asked me, what makes it obvious that the labor classifications have to be evaluated using the SCA? Well, the first thing I would look at is other cases that I cited at my initial brief on page 25. And those are the cases like systems research, TNM, and source one. And they are the cases that have to do with the source realism analysis. But the analysis of those courts, of those There's a provision in this contract that says that there will not be any cost realism analysis. That's right. But we can still use a portion of the reasoning of those courts where it is analogous, I believe. Because what those cost realism cases did is they said, we're looking at a solicitation. The solicitation requires a cost realism analysis. A cost realism analysis requires the contracting officer to evaluate labor classifications. How do you evaluate labor classifications? Again, the forums, the GAO, or the claims court said, well, the obvious way to evaluate labor classifications is to apply the SCA, which is made applicable by other provisions of the contract. And we can do the analogous reasoning here, which is you look at the solicitation and say, is there something in the solicitation that says we evaluate labor classifications? The cost realism analysis isn't there, so it doesn't. But in our case, the language of the evaluation criteria says, yes, evaluate labor classifications. So once that happens, then we can look to these cases that say, if you have to evaluate labor classifications, how do you do it? And they say, the way you do it, the only logical way to do it is to turn to the Service Contract Act because that governs the labor classifications. Then the cases go further. And they say, get down to the nitty gritty of how you do it. Where's the government estimate here? The government estimate is at 202. I would like to also point to you, though, sir, a provision in the RFP that supports what I just said. And that's at page A48. A48 is where it says the directory. That's the directory of job DOL labor classifications, job classifications, the same thing, that's put out under the SCA. It's the bottom paragraph on page 48. It says, the directory should be used to compare job definitions to ensure that the duties requested, that means the duties under this solicitation, are not performed by a classification already listed in the wage determination. Now here, it's talking about, it's telling the contractor to do this before starting the process for conforming a classification. But it's saying that this is how you determine or make this determination. And so this supports what we're saying about how you do this. And there's also another case called EL Ham that explains it. And EL Ham is 99-1 CPD 85 at page 6. And it says, you perform a comparison of the language in the PWS with the definitions in the directory. And in this case, EL Ham went on to say, it demonstrated that it was unreasonable for the agency to agree that the particular labor category was an appropriate class of service employees to perform the task at issue. And while we recognize the importance of permitting offerors to propose innovative staffing approaches, that staffing approach must include staff that appropriately can be used to perform the PWS. And here, the combination of the language of the PWS and the labor category descriptions in the DOL's directory, which is the ones that are issued under the aegis of the SCA, rendered unreasonable the cost analysis position, because this was a cost analysis case. But here, we have the same duty imposed upon the contracting officer by the evaluation criteria that rendered unreasonable. Ms. Davis, you're beyond your allotted time. Oh, I'm sorry. Why don't we hear from Mr. Rayl, and we'll give you a minute to follow up with him. Yes, your honors. May it please the court. The trial court correctly determined that your theory is that labor classifications doesn't refer to the service contract act. The way the solicitation evaluation criteria was laid out was that the labor classifications were to be evaluated against the government estimate. So no, the purpose of having labor classifications evaluated was not to evaluate them against the service contract act, but to evaluate them against the government estimate to ensure that the problem is with that argument that the government estimate seems to be listing these positions as exempt or non-exempt for purposes of the service contract act, if you look at 202. Yes, your honor. The government estimate does list labor classifications, the Department of Labor's labor classifications as well as non-exempt. So that column referring to exempt or non-exempt is referring to the service contract act, correct? Yes, your honor. That's correct. So they seem to have a point, don't they, that labor classifications in the contract refers to the service contract act classifications? Well, to the extent that the offers were to include labor classifications in their proposal, yes. That they were to include DOL labor classifications, or of course, if it was exempt, they were to include another, the classification that they've created that's exempt. But what the purpose of the evaluation criteria was not to evaluate against the government estimate to determine whether or not it complied with the service contract act. The government estimate may or may not comply with the service contract act. The purpose was to determine whether the offer had proposed an appropriate number and mix of employees to perform the required work. But what the agency was trying to determine here was can this offer perform the work? Can the offer do the videography? So you're saying that the contract obligated them to compare the bid with the government estimate, but not the bid with the service contract act? Correct, your honor, yes. And again, there are a few circumstances in which an agency would be required to compare the offer's bid against the service contract act. And those the trial court correctly stated is. Well, was there any evidence about whether this comparison between the bid and the government estimate at the labor classifications took place or didn't take place? It did not. It didn't take place. Oh, against the government estimate. I'm sorry. Yes, your honor, it did. And that would be in the price negotiation memorandum, which I believe is at pages 115 through 120. And that's page 118 specifically, I believe, deals with five rivers. Where do I come in on 118? 118, the very bottom bullet point. The offer staffing plan indicated an understanding and capability to provide scope of services required when compared to the government estimate. The government estimate is 24 positions. The offer is staffed for, you can see the number of positions. Staffing level and labor mix are appropriate for performance of the required services. So this page demonstrates here, they did compare against the government estimate. And they compared for purposes of determining whether the level and mix is appropriate to perform the services. That's what the Army was primarily interested in this case. This case is not a situation where it's a cost plus type contract, where we have a cost realism analysis. As the court correctly pointed out, the solicitation explicitly precluded a cost realism analysis here. Do you ever have cost realism analysis in a fixed price contract? I don't necessarily understand why you would, but I'm not going to say it doesn't happen. I think I've seen this before. One reason you might, I suppose, is to make sure that you don't get a ridiculously low-balled offer, which suggests that either the bidder didn't understand the scope of the project, or that the bidder was going to take a flyer at being able to get the contract and hope that something good would happen, and then abandon it at some point. You certainly don't want to have a shaky bid to get the contract. No, no, Your Honor. Even if it's fixed price, because it doesn't do you any good if the contract doesn't get completed. No, Your Honor. Certainly not. And in fact, the FAR doesn't require a cost realism analysis for fixed price, but it still does require a price reasonableness analysis. And that would be covered by what Your Honor is talking about. A price reasonableness analysis is typically satisfied by comparing the offers against one another to ensure that adequate price competition, that one's not way off from another one. Here. I'm going to the FAR with my distinction between cost realism and cost reasonableness. Well, perhaps the language doesn't suggest a great distinction. But in fact, there is a great distinction in practice. Because in a realism analysis, what the agency is trying to determine is whether or not the offer is actually likely to perform the work at the cost or price proposed, whether they're likely to be able to do it. And in a cost plus contract, that's of course very important, because the government would be paying the cost. In a fixed price contract, that's not particularly important to the government. It doesn't matter whether they can actually perform the work at the cost proposed or if they take a loss on this contract. What's more important is it's reasonable, and you don't end up in a situation like Your Honor was suggesting, where they're just way over budget and then abandoned, or they're not a responsible offer or something like that. So there is a difference. Even if the language isn't quite as clear as perhaps, there is a difference in practice. So that's one circumstance of cost realism. As the plaintiff mentioned, another circumstance would be if the solicitation criteria for some other reason said that the labor classifications had to be evaluated against the Service Contract Act. As we just discussed, that's not the case in this solicitation. Third situation would be if an offeror's proposal indicates on its face an intent not to comply with the Service Contract Act. And that situation also doesn't apply in this case. Here, the Army had, in this case, what I should say is after more than two years of litigating this case, KMI is still yet to provide one decision by this court, the Court of Federal Claims, the GAO, or any other tribunal that sustained a protest based upon the fact that an offeror proposed incorrect or questionable labor rates or exemptions. Rather, in the GAO, the GAO has held that where an offeror proposes to perform work at a rate that's below what's required by the Service Contract Act, that doesn't by itself necessarily constitute evidence of an intent not to comply with the Service Contract Act, but rather may simply be a legally unobjectionable, below-cost offer. And the Alan Norris-Vance decision that we cite in our brief is a good example of that. And another GAO decision that we cite, Free State Reporting, persuasively explains why. And although in that case, it doesn't appear that the awardee disclosed its wage rates on the face of its proposal, the awardee did appear to have mistakenly based its proposal price on a wage rate that it later admitted was more than 25% less than what the Service Contract Act required. And the GAO concluded this wasn't problematic, because since it was a fixed-price contract, the awardee was still required to compensate its employees at the rates required by the Service Contract Act. And it had agreed to do so, but the agency was only required to pay the awardee based upon its proposed prices. Now, what is it suggested by the term disclosing on the face of the bid that you don't intend to comply with the Service Contract Act? Presumably, no one sends in something that says, you know, I have absolutely no intention of following this silly statute. So presumably, there's something that more is required. And I'm wondering whether it is enough if, for example, I have a bid, and I have every single one of my 180 people that are going to work on it, the contract marked exempt, and including people who are clearly in the lowest levels of responsibility. Would that be disclosing on the face of the contract, in the sense that you're using that term that you don't intend to comply with the SCA? Well, Your Honor, if on the face of the proposal, an offer included, or I should say, proposed to exempt janitorial services or something from the Service Contract Act, in that situation, there could potentially be evidence of an intention not to comply with the Service Contract Act. Conceding, if that's true, that there is some responsibility to look at the list and the designations and so forth, and determine whether this appears to be a good faith effort to comply with the act or not, right? I think that's the word good faith was important there. If what they're saying is just so implausible that it couldn't possibly comply with the Service Contract Act, that could be an indication of an intention not to comply with the Service Contract Act. But that's not the situation we have here, where we- So pursuant to the act, you have regulations which classify certain types of employees like janitorial services? Are the regulations that say these kinds of employees are non-exempt? There are regulations that distinguish between the types of duties that would typically be exempt and typically be non-exempt. Well, that wasn't really my question. My question was, does it specify certain employees by work description rather than general responsibility? As far as the regulations themselves, I don't believe that they do. There are statements in the regulations that quality control might be an administrative type duty. Script writing might be a creative professional type duty, and they meet the rest of the tests, such as independent judgment and the rest of the tests set forth for the executive, administrative, or professional exemption. But the regulations themselves don't, I believe, set forth this position is non-exempt. This position is exempt in and of itself. And one thing I would point out also on that question, though, is that even though we think that there very well could potentially be a situation where ridiculous exemption determinations could potentially evidence an intent, I'm not aware of any GAO case law, court of federal claims case law, et cetera, that states that. Rather, an example of the type of situation where an offer was held to have evidenced an intent not to comply with the Service Contract Act was where an amendment incorporated the Service Contract Act into the solicitation, and the offer didn't acknowledge that amendment. That's an example of a type of situation the GAO has held is a situation where the offer is indicated an intent not to comply with the Service Contract Act. An alternative ground to affirm the court's decision, even if the court were to somehow find that the agency erred in not evaluating Five Rivers' potential Service Contract Act compliance, is that KMI can't prove that it was prejudiced in this case. As we demonstrated in our briefing, Five Rivers' proposed labor rates for the six positions KMI questions are actually higher in the aggregate than the labor rates the Army anticipated would be used in the government estimate. Accordingly, it appears that adjusting Five Rivers' proposed price to correct the allegedly illegal exemption determinations would actually reduce Five Rivers' price rather than raise it. And it certainly wouldn't raise Five Rivers' price by the substantial amount necessary for KMI to become the lowest-priced technically acceptable offer in this case. So for these reasons, we respectfully request that the court affirm the trial court's well-reasoned decision. Thank you, Mr. Rayl. Ms. Gable, can you please put that up? I would like to point something out. The court below, the claims court, and I feel the government as well throughout this case, has consistently confused two terms. And they've confused a misclassification of a job description or a labor classification, which happens when a position is already under the SCA with the term exemption, which means you're exempting a position from the SCA altogether. You don't get to classify a position until you decide that it's not exempt, and then it falls under the SCA. And then you get to classify it. And in this regard, the SCA appears to treat its exemptions a little bit differently than the FLSA, I found. And if you look on page A374, where I included a definition from the SCA of service employee, it says if it falls under a DOL classification under the SCA, it's mutually exclusive with an exemption. It's one or the other. It can't be both. It's not optional. So the fact that the IGE found that these classifications fell under the SCA and were not exempt means that that's the way it was, and they could not also be exempt. And that's also the way it's defined in FAR 52.222-41A. Now the FLSA treats its exemptions and says, well, you can still fall under the FLSA and just not be exempt from the minimum pay requirement. But that's not an issue here. And that's included in a treatise 371 if the court is interested in that. The other thing I would like to point out that there was no evidence in the record that the government evaluated labor classifications or compared labor classifications to the SCA or to the IGE at all. All that's in there is a conclusory statement. There's a conclusory statement that, yes, that's in there. And yes, we compared it. Yes, we thought the labor mix was appropriate. That doesn't meet the test that I cited in my brief on page 20. I have the information in my brief for Great Lakes-Pitts Lake. The other thing I would like to add is that Five Rivers got a competitive advantage by doing what they did, by posing these exempts. They were able to exempt 25% of their labor force from all of the labor burden, the performance risks, and minimum wage rates on a $10 million contract, on a services contract. So 25% is substantial. So we're familiar with the numbers. All right. Thank you, Ms. David. Thank you. I think we have your case, and we thank the council. The case is submitted. All rise.